IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 19, 2008 Session

STATE OF TENNESSEE v. TONY LEE CROWE

Direct Appeal from the Criminal Court for Putnam County
No. 06-0304     Leon C. Burns, Jr., Judge

No. M2008-00092-CCA-R3-CD - Filed March 2, 2009

The defendant-appellant, Tony Lee Crowe (hereinafter "Crowe"), was convicted by a jury of two counts of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony. He received an effective sentence of sixteen years' imprisonment in the Tennessee Department of Correction. He now appeals challenging (1) the sufficiency of the evidence, (2) whether the trial court properly exercised its role as the thirteenth juror, and (3) the denial of his amended motion for new trial based on new evidence. After reviewing the record and the applicable authorities, we affirm Crowe's convictions but remand the case for the sole purpose of considering the third amended motion for new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed In Part; Remanded for Consideration of Third Amended Motion for New Trial**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

H. Marshall Judd, Cookeville, Tennessee, for the appellant, Tony Lee Crowe.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William Gibson, District Attorney General; and David Patterson and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Trial.** On December 15, 2006, Crowe was convicted by a jury of two counts of rape of a child and two counts of aggravated sexual battery. At trial, the State presented several witnesses

including Dorothy Sevier, Sue Ross, M.M.,[1] and M.S.,[2] the victim. Dorothy Sevier, the victim's mother, testified that the victim was under 13 years of age during the time listed in the indictment. She explained that their home was close to Crowe's, that her family "spent a whole lot of time" with Crowe's family, and that she considered them to be friends. Sevier allowed the victim to visit Crowe's family without her supervision when the victim was older. She stated the victim would visit Crowe's home "almost everyday" to "[play] on the computer, and [do] some homework." Sevier also testified that the victim told her she went to Crowe's house because "[she had] to have something to do."

Sevier stated that before Crowe and his family moved away, "the victim wanted [her] to tell [Crowe] that she had went [sic] to [Sevier's] niece's house" when in reality the victim "stayed hid [sic] in [Sevier's] house, and [] didn't want to take no [sic] phone calls or anything." When Crowe eventually moved away, Sevier was concerned because he would repeatedly call the victim . Sevier testified that Crowe sent the victim a birthday card with a handwritten note which stated, "I love you and miss you." Sevier read the card, which was addressed to the victim, and later provided it to the police. After reading the card, Sevier was "upset" because "it didn't really sound right." Consequently, Sevier telephoned the parents of M.M., the victim's friend, who she later understood was "involved too."

Sevier also testified that Crowe sent the victim a Christmas card. After receiving the Christmas card, Sevier contacted the police. Crowe continued to call the victim's home so much they were forced to get a new phone number. On cross-examination, Sevier admitted that after the Crowe family moved away, she and the victim traveled to Sevierville to visit them. Crowe and his family rented cabins in the Smokey Mountains for the victim and her family. Sevier and the victim stayed in a cabin with Crowe's mother while the victim's father stayed in a cabin with Crowe. Sevier also admitted that the families loaned each other money. She stated that Crowe "would always buy [the victim] stuff." He would specifically buy her wolf figurines and burn songs onto CD's for her to play at home. Sevier explained "it kind of bothered [them] . . . but [Crowe] kind of insisted on doing it." She knew that Crowe had some health problems and that he was on a breathing machine at home. She further testified that during the time period listed in the indictment she was not working and was at home "almost every day."

Between 2002 and 2005, Sevier stated that the victim's pediatrician was Dr. Christopher Climaco. In 2005, she switched doctors and took the victim to Cookeville Medical Center. Although the victim at one point expressed an interest in moving to an apartment in Sevierville, Sevier testified that the victim later begged her not to move.

---

[1] This witness is a minor who is noted in the record as a victim in a related case. Thus, we will refer to this witness by initials only.

[2] In keeping with this Court's policy regarding victims who are minors, we will refer to the victim in this case by initials.

Sue Ross, an employee at Our Kids Center in Nashville, testified that Our Kids Center is an out-patient facility of Metro Nashville General Hospital. Ross began working in the nursing field in 1968. She received her nursing diploma from St. Thomas School of Nursing in Nashville; her bachelor's degree in nursing from the University of Tennessee Center for Health Sciences in Memphis, where she also went through the pediatric nurse practitioner program; and her master's degree in nursing from Vanderbilt University in Child and Adolescent Health.

Ross stated that she had previously testified numerous times in criminal and civil cases. She had personally examined "around 3800" children that had been the victims of sexual assault. Ross explained the normal protocol under which a child is examined by Our Kids Center and confirmed that the victim was seen at the Our Kids Center on March 21, 2006. Ross testified that she medically examined the victim and prepared a report. Ross's examination of the victim revealed the following:

> From the non-genital standpoint, a normal exam. A child that had, clearly was going through, or at least in puberty, based on tanner (spelled phonetically) staging of her breasts. For the genital area, what I found was, again, a child who was pubertal. I found an estrogenized hymen.

Ross was unable to confirm or deny any type of sexual abuse to the victim. However, Ross explained that her findings were not inconsistent with the victim's complaint because the hymen does not always tear when digital, genital, or penile genital penetration occurs. On cross-examination, defense counsel asked, "But if you were talking about rape, you might find signs of injury, a doctor or a nurse might find signs of injury, or bruising, or something like that, wouldn't they?" Ross replied:

> You might. The greater odds are, you will not. The vast majority of children that we see non-acutely, like we saw with [the victim], and even acutely, when we see them in the emergency room hours to a couple of days after their assaults, ordinarily have virtually no physical findings. That's the rule. It's the exception that there are tears in the hymen.

The victim, M.S., testified and confirmed that she was less than thirteen years old during the period listed in the indictment. She identified Crowe at trial. She said that she met Crowe when she was three years old and that he was a "family friend." She stated that she would go to Crowe's house to play video games on the computer in Crowe's room. Her house was within walking distance of Crowe's, and sometimes her parents would allow her to go to Crowe's house without them.

When the victim was nine years old, she was in Crowe's room playing a video game. Crowe's mother was in the kitchen doing dishes. The victim testified that Crowe's mother briefly came into Crowe's bedroom, but she left. At some point, Crowe closed the door to the room and "something bad happened." Crowe told the victim to take her pants off and go by his bed. The victim took her pants and panties off. Crowe did not have on any pants or underwear. Crowe told the victim to "bend [her] legs up," and he held her legs at her shoulders and touched her "private part

and [her] breasts." The victim was asked what she meant when she said "private part," and she explained, "My vagina? I don't know." The victim testified that Crowe put his penis all the way inside her vagina and that it hurt.

During the above incident, the victim stated that Crowe had a weapon in the room. She was shown a photograph of a weapon and confirmed that it was the same weapon that she saw in Crowe's room. The picture was entered into evidence as Exhibit 3. The victim stated Crowe held the weapon to her throat and told her if she told anyone about what he had done to her, he would kill her family in front of her and then kill her. The victim testified that she believed him.

Sometime between September 2004 and October 2004, another incident occurred. The victim recalled she was working on a school science project and asked Crowe if she could use his computer. She stated that M.M., "a really close friend" from her neighborhood, went with her to Crowe's house. Crowe and his mother were at his home. The victim testified that she finished her school project, but at some point, she found herself in Crowe's room with M.M. Crowe closed the door and told her to take her pants and panties off. The victim further testified that Crowe touched her breasts and her vagina with his fingers. However, Crowe did not threaten her. The victim stated Crowe "practically done [sic] the same thing he done [sic] the first time."

Another incident occurred around the end of June 2005, prior to Crowe's moving away. The victim stated that she was in Crowe's room, and that "[Crowe] forced her again to do the same thing that he'd done for the other two times." Crowe touched the victim's breasts and penetrated her vagina with his penis. It was only after the third incident that the victim told someone what was happening. The victim was afraid to tell anyone because she believed that Crowe would kill her parents and her family. The victim also confirmed that Crowe (1) sent her two cards, (2) would buy her gifts, (3) told her he loved her, (4) talked about marrying her, and (5) telephoned her incessantly.

On cross-examination, the victim admitted that before the incidents she had visited Crowe's home almost every day to do her homework. The victim described Crowe's home as a small, two bedroom apartment with a living room, bathroom, and kitchen. When asked why she took her pants off, the victim replied, "Because he had threatened me with the gun first." The victim explained that she continued to go back to Crowe's house after the first incident "[b]ecause he told [her] to." She stated that she did not yell or scream while Crowe penetrated her even though it hurt. She further confirmed that Crowe's mother was in the apartment when each incident occurred. She stated that she would make telephone calls to Crowe "[s]ometimes." She agreed that Crowe would give her money and that her family would go to his apartment for dinner and to watch television.

M.M., the victim's friend, testified that she went to Crowe's house, along with the victim, to work on a school project. At some point, she and the victim were in Crowe's room with the door closed. Crowe's mother was either in the kitchen or her room. M.M. testified that Crowe told the victim to take her clothes off and then touched the victim with his finger. When pressed by the prosecutor about specifics, M.M. only replied affirmatively to Crowe touching the victim "where she goes to the bathroom" and on her "boobies." On cross-examination, M.M. explained that it was both

the victim's and her idea to go to Crowe's house the day this incident occurred. She saw a gun the day of the incident but did not tell anyone about it "[b]ecause [she] got scared."

Yvette Deming, a sergeant with the Cookeville City Police Department's Criminal Investigation Division, testified that she spoke with Crowe regarding the allegations in this case. Sergeant Deming stated that Crowe was cooperative and confirmed that the victim visited his home "just about every day" and had been in his bedroom "a number of times." He admitted to previously calling the victim's home "15 or 18 times" a day because her family was not answering his calls. He called the police department to perform a "welfare check" on the family to ensure they were safe. Sergeant Deming asked Crowe if he had any weapons in the home, and Crowe told her that he kept a number of weapons locked in a gun cabinet. Sergeant Deming also asked Crowe's mother if there were any other weapons in the home, and Crowe's mother showed her a rifle wrapped in camouflage tape that she had placed under a blanket on her bed. Sergeant Deming was shown Exhibit 3 and confirmed that it was the same rifle she recovered from Crowe's home. Crowe also admitted to Sergeant Deming that in October of 2005, he sent the victim a birthday card and wrote, "I love and miss you very much, [M.S.]" on the envelope. The handwritten letter inside the card stated the following:

> [M.S.], I'm still waiting on your answer[,] and you know that I love you more than anything in this whole world, and it's killing me being away from you and not being able to spend any time with you, because you're the light of my life and the only happiness I've ever know [sic]. And since you're not here with me, it feels like my whole world has been taken away from me. I don't know why you don't bother to take the time to call me even for a few minutes when you know how much I love and miss you. I hurt every day that I can't be with you, or hear your voice to know that you're all right and no one is hurting you or worse. I worry about you all the time, and I think about you all the time. I've never let anyone as close to my heart as I have you, and I've never let myself love anyone as much as I love you. I'm sorry that I'm not there on your twelfth birthday, but you never bothered to care enough to even ask me to come, so I sent you my love in this card.

The letter was signed, "Love always and forever, [Crowe]. Call me. [Crowe's phone number] My number. Don't lose it. Write it down."

In the Christmas card sent to the victim that was postmarked December 24, 2005, Crowe wrote:

> [The victim's name], I love and miss you very much, and I don't know why you're treating me the way you are and doing the things that you're doing when you know how much I love and care about you. I do not like your silence that you are giving me, but I will respect your decision to shut me out of your life if that's what you really want, because that's how much I love and care about you. I've shown you nothing but love and kindness. If you no longer want my love and friendship, I have

no choice but to do what I have to do, because everyone's fate is sealed by the choices that they make. I want to wish you a very Merry Christmas and a Happy New Year, and if I don't hear from you soon, I will know what your answer is. Your silence to me means you want nothing to do with me anymore, or you calling me means that you do, but either way, I'll know for sure. Love, [Crowe] P.S. Remember, I have always loved you and always will.

Crowe told Sergeant Deming that the two aforementioned letters were written in the same context as a father writing a letter or sending a card to his daughter.

The defense proof consisted of Dr. Christopher Climaco, Shirley Harris, Debra Davidson, and the defendant-appellant. Dr. Christopher Climaco, the victim's pediatrician, testified that he went to medical school in the Philippines and was a board-certified medical doctor. He completed a three-year pediatric residency in New York City. He further testified that he had been a doctor for the past eleven years. The defense offered Dr. Climaco as an expert without identifying a specific area of expertise. He was admitted as an expert without objection from the State. Dr. Climaco testified that the victim was one of his patients from August 2000 to November 28, 2005. On July 11, 2002, Dr. Climaco "checked the victim for sexual abuse." His examination revealed "no evidence of sexual physical abuse, and the vagina was normal, without any signs of trauma." Dr. Climaco stated the victim told him "nothing happened," and he had written "'nothing happened' according to patient" in quotation marks in his notes. Additionally, according to Dr. Climaco's records, he did not perform another examination for sexual abuse in 2002. Dr. Climaco further testified that he saw the victim on October 8, 2004, October 26, 2004, November 9, 2004, February 7, 2005, September 22, 2005, and November 28, 2005. Dr. Climaco treated the victim on these dates for a variety of things, none of which were related to sexual abuse. However, on May 26, 2005, the victim had a physical exam of her genitalia which was normal. Dr. Climaco explained that a finding of "normal female genitalia" meant that he did not "see any discharges, . . . signs of trauma, or any signs of inflammation." His records did not indicate whether the victim's hymen was intact during this examination. Dr. Climaco testified that he had examined thousands of children and "[w]ith full penetration, the hymen should not be intact."

On cross-examination, Dr. Climaco agreed it would be difficult for a child to tell him about sexual abuse. Although he received training regarding sexual abuse during his residency, Dr. Climaco had not attended any "updated classes, or continuing education each year about sexual abuse[.]" Dr. Climaco explained that whether the hymen is torn by digital penetration of a child's vagina depends on how far the finger is inserted. When questioned about his testimony during direct examination that the hymen could not be intact with full penetration, he stated he did not know if a child's age, particular genetic make-up, or the elasticity of the hymen would make a difference.

Shirley J. Harris, Crowe's mother, testified that both she and her son were disabled and received Social Security. She stated that Crowe was thirty-eight years old, had lived with her since he was born, and had "a lot of medical problems." She first met the victim and her family when the victim was three years old. Harris emphasized that her apartment was "really small." When the

victim would come to her home, Harris explained that she and Crowe would help her with her homework. According to Harris, the victim never went into Crowe's room without her because the victim followed Harris around "like a little chick." If the victim did go into Crowe's room, Harris testified that the door would remain open. Harris stated that Crowe had a shotgun that he kept locked in a gun cabinet, and she had a rifle. Both weapons were obtained "strictly for [] home protection." Harris stated the victim knew about both weapons.

Harris recalled the day that M.M. and the victim came to visit her home to work on a school project. Harris testified Crowe went into his bedroom and retrieved some information from the computer. He came into the living room and gave it to the victim and M.M. Harris watched the victim and M.M. work on the project until they were finished. She stated neither the victim nor M.M. ever went into Crowe's room alone. On cross-examination, Harris maintained that the victim was never in Crowe's room without her.

Debra Davidson, Crowe's sister, also testified that Harris and Crowe moved to Sevierville to be near her in May of 2005. Prior to moving to Sevierville, Davidson lived in Cookeville and frequently visited Harris' apartment because they were very close. She also confirmed that the victim often visited Harris' apartment. She stated the only time the victim would be in Crowe's room was when a group of them were playing a video game together. In response to being asked whether she had seen anything inappropriate happen to the victim, Davidson stated the victim had just come from home and told her, "My butt hurts." Davidson testified that the victim would cry and "throw a fit" whenever her father wanted her to come home. Finally, Davidson stated that whenever she was at Harris' apartment, she never observed her brother do anything inappropriate to the victim.

Crowe testified that he completed the ninth grade and then obtained his GED. He stated he was an oxygen patient and had several medical conditions; including, sleep apnea, epilepsy, diabetes, and back trouble. On May 1, 2005, Crowe moved to Sevierville to be with his sister. Before he moved, he lived close to the victim in a small apartment with his mother. He denied the allegations as testified to by the victim. Crowe provided a lengthy explanation as to why he wrote the two aforementioned letters to the victim but confirmed that he did so because "[he] love[d] her . . . like a child, just like any adult or any parent would love a child that they had practically raised from a little small child up."

Crowe took the victim and her family to church with him and attended Sunday School class during the time period he was alleged to have committed these offenses. He admitted to having weapons but stated they were only for protection. He denied threatening the victim and testified that he had never been convicted of a misdemeanor or a felony. He stated that M.M. came to his home once with the victim and that he helped both of them with a school project. According to Crowe, neither M.M. nor the victim ever entered his bedroom that evening.

Based on the foregoing proof, the jury convicted Crowe as charged, and he initially received a sixteen-year sentence of imprisonment for each of the two counts of rape of a child, to be served

consecutively, and a nine-year sentence for the aggravated sexual battery conviction,[3] to be served concurrently, for an effective sentence of thirty-two years. Crowe filed a motion for new trial on February 27, 2007, arguing the insufficiency of the evidence, and filed an amended motion for new trial on April 17, 2007, arguing the trial court erred in imposing consecutive sentences. On July 13, 2007, the trial court conducted a hearing on the above motion as amended wherein it denied Crowe's motion for judgment of acquittal but modified his sentences for the two counts of rape of a child to run concurrently. Crowe filed a third amended motion for new trial on September 17, 2007, and attached an affidavit from defense counsel stating, among other things, that he had interviewed M.M. and that she had provided false testimony at trial. The trial court entered a written order denying the motion for new trial which was entered on December 5, 2007, <u>nunc pro tunc</u> to July 13, 2007. Crowe filed his notice of appeal on January 3, 2008.

## ANALYSIS

**I. Jurisdiction.** As an initial matter, we must first address whether Crowe timely filed his notice of appeal. A notice of appeal must be filed within thirty days of the judgment from which the appeal is taken or from the entry of an order denying a motion for new trial. Tenn. R. App. P. 4(a), (c); <u>see</u> <u>Crittenden v. State</u>, 978 S.W.2d 929, 932 (Tenn. 1998). However, the appellate court in a criminal case may waive the timely filing of a notice of appeal "in the interest of justice." Tenn. R. App. P. 4(a), (c). Here, Crowe filed his notice of appeal almost five months after the trial court held a hearing and orally denied in part his motion for new trial. Even though the trial court did not enter an order memorializing the denial, the trial court's determination is clearly reflected in the transcript of the matter on July 13, 2007. The trial court further entered an amended judgment on July 17, 2007, noting, "This amended judgment reflects . . . during the defendant's motion for new trial, the judge ruled based on the record as a whole, that counts 1 and 2 shall be concurrent instead of consecutive." <u>See</u> <u>State v. Perry A. March</u>, No. M2006-02732-CCA-R3-CD, 2008 WL 2743752, at *2 (Tenn. Crim. App., at Knoxville, July 15, 2008) (providing that minute entries or judgments "are 'principal records' establishing a court's actions through its orders.") (citation omitted).

However, we recognize that the trial court did not enter a written order denying the motion for new trial until December 5, 2007, <u>nunc pro tunc</u> to July 13, 2007. Crowe's notice of appeal was timely filed from the entry of the December 5, 2007 written order. This court has previously stated:

> Although Tennessee Rule of Criminal Procedure 33 . . . does not by its terms require the trial court to enter a written order disposing of the motion for new trial, Tennessee Rule of Appellate Procedure 4(c) clearly keys the time for filing the notice of appeal to the "<u>entry</u> of the order denying a new trial." Thus, although no written findings of fact are required, the trial court must rule on the motion and enter an order to start the clock for any appellate proceedings.

---

[3]The trial court merged the two counts of aggravated sexual battery.

-8-

State v. Eric Condrell O'Neal, No. M2007-02885-CCA-R3-CD, 2008 WL 4756459, at *1 (Tenn. Crim. App., at Nashville, Oct. 28, 2008) (emphasis in original) (internal citations omitted). The State does not challenge the timeliness of the notice of appeal based on the December 5, 2007 entry of the order. We will, therefore, consider the merits of this appeal.

**II. Sufficiency of the Evidence.** Crowe challenges the sufficiency of the convicting evidence, and argues, as he did before the jury and the trial court, that there was no proof corroborating the victim's testimony that she had been raped. He additionally contends the trial court erred by not granting him a new trial as the thirteenth juror based on the same lack of proof. The State counters that the convicting evidence supports every element of Crowe's convictions, and the accuracy of the trial court's thirteenth juror determination is not proper for appellate review. We agree with the State.

When the defendant challenges the sufficiency of the convicting evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) (2006) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."). This standard applies to convictions based upon direct, circumstantial, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citation omitted). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, and this court will not reweigh or reevaluate the evidence. State v. Sutton, 166 S.W.3d 686, 689-90 (Tenn. 2005). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

In order to sustain Crowe's two convictions for rape of a child, the State was required to prove beyond a reasonable doubt that Crowe sexually penetrated the victim and that the victim was more than three (3) years of age but less than thirteen (13) years of age. T.C.A. § 39-13-522 (a). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

Similarly, in order to sustain Crowe's aggravated sexual battery conviction, the State was required to prove "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

In this case, the victim testified that Crowe put his penis inside her vagina on two different occasions. She also testified that sometime between September 2004 and October 2004, Crowe touched her breasts and her vagina with his fingers and "practically done [sic] the same thing he done [sic] the first time." These incidents corresponded to the dates of the indictment, and the victim confirmed that she was less than thirteen years old at the time that these incidents occurred. Our supreme court has determined that the testimony of a child victim, alone, is sufficient to uphold a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); see also State v. Warren Curnutt, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *11 (Tenn. Crim. App., at Nashville, May 22, 2007), perm. to app. denied (Tenn. Sept.17, 2007). Additionally, as previously stated, the credibility and weight given to witness testimony are matters resolved by the trier of fact, not this court. Accordingly, we conclude that there was sufficient evidence to convict Crowe of two counts of rape of a child and one count aggravated sexual battery.

Crowe similarly argues that the trial court failed to properly weigh the evidence in its role as the thirteenth juror. In response, the State contends this issue is barred from appellate review. We agree with the State.

Tennessee Rule of Criminal Procedure 33(d), states "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d); State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)(holding trial court has a duty to serve as the thirteenth juror). Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. Id. Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

In this case, the trial court denied the motion for new trial and stated:

So, the question, I suppose, here today is, there are two questions: the weight of the evidence, and the sufficiency of the evidence. And as a 13th juror in the case, and in evaluating the weight of the evidence, I see no reason to discredit the victim in the case in regards to what she alleged happened. So, as from that point of view, there is sufficient – there's weight given to the evidence and [the evidence is] proper for a conviction.

The record in this case shows the trial court properly fulfilled its role as the thirteenth juror; accordingly, this issue is not subject to appellate review.

**III. <u>Amended Motion for New Trial Based on New Evidence.</u>** Crowe argues the trial court erred because it did not allow an amended motion for new trial based on newly discovered evidence. In response, the State maintains the trial court properly refused to allow Crowe to amend his motion based on new evidence.

Rule 33(b) of the Tennessee Rules of Criminal Procedure allows the trial court to "liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial." Tenn. R. Crim. P. 33(b). A judge may allow, at his or her discretion, an amendment to a motion for new trial at any time during which the trial judge has jurisdiction. <u>State v. Bough</u>, 152 S.W.3d 453, 461 (Tenn. 2004) (citing <u>State v. Butler</u>, 626 S.W.2d 6, 12 (Tenn.1981); <u>State v. Washington</u>, 658 S.W.2d 144, 146 (Tenn. Crim. App.1983) (an amendment to a motion for new trial comes too late when it is filed after the trial judge has ruled upon the merits of the original motion)). The trial court loses jurisdiction once the notice of appeal is filed. <u>State v. Pendergrass</u>, 937 S.W.2d 834, 837 (Tenn. 1996).

Here, the trial court heard the original motion for new trial and denied Crowe's motion for judgment of acquittal or new trial, but modified his sentences for rape of a child on July 13, 2007. The transcript shows the trial court orally disposed of the motion and entered amended judgments to reflect its ruling on the same day. Two months later, Crowe filed a third amended motion for new trial alleging the discovery of new evidence. On December 5, 2007, the trial court entered a written order denying the motion for new trial from July 13, 2007, <u>nunc</u> <u>pro</u> <u>tunc</u>. The trial court obviously relied on its oral denial of the original motion for new trial because no ruling on or mention of the third amended motion for new trial is in the record. On December 17, 2007, Crowe filed a motion to set aside the trial court's December 5th written order denying the motion for new trial because no action had been taken on the third amended motion for new trial. When no action was taken in response to the motion to set aside the previous order, Crowe filed his notice of appeal. In our view, the record does not reflect an adequate basis upon which the trial court exercised its discretion to ignore or reject the third amended motion for new trial. Accordingly, we remand this case for consideration of the third amended motion for new trial.

**Conclusion**.  Based on the foregoing, Crowe's convictions are affirmed but the case is remanded for consideration of the third amended motion for new trial.

_____
CAMILLE R. McMULLEN, JUDGE